ACCION SOCIAL de PUERTO RICO,
INC., Plaintiff, Appellee,

v.

Norberto VIERA PEREZ, etc., et al.,
Defendants, Appellants.

No. 87–1151.

United States Court of Appeals,
First Circuit.

Argued July 28, 1987.

Decided Oct. 20, 1987.

Opinion on Denial of Rehearing
Nov. 23, 1987.

Pedro Juan Perez Nieves with whom Saldana, Rey, Moran & Alvarado, Santurce, P.R., was on brief, for defendants, appellants.

James L. Feldesman with whom Susan D. Lauscher and Klores, Feldesman & Tucker, Washington, D.C., were on brief, for plaintiff, appellee.

Before BOWNES, NOONAN * and SELYA, Circuit Judges.

BOWNES, Circuit Judge.

This consolidated appeal involves the Community Services Block Grant (CSBG) Act, 42 U.S.C. § 9901 et seq. (1982), and two orders of the District Court of Puerto Rico. Appellants Norberto Viera Perez, Executive Director of Puerto Rico Office of Economic Opportunity (PROEO), and PROEO challenge two orders issued by the district court in favor of appellee Accion Social de Puerto Rico (ASPRI), a nonprofit private organization. Both orders mandated that PROEO continue funding ASPRI at the level approved for the 1985 fiscal year unless PROEO could show, in the statutorily required administrative hearing, that sufficient cause existed for termination of funding. For the reasons that follow, we vacate the orders issued by the district court.

*Statutory Background*

The CSBG program began in 1981, but its antecedent program dates back to 1964 with the enactment of the Economic Opportunity Act (EOA). The EOA was enacted to provide federal funds to help alleviate the causes and effects of poverty in this country. That Act was administered by the Office of Economic Opportunity, which was renamed the Community Services Administration in 1975. The CSBG Act of 1981, passed as part of the Omnibus Budget and Reconciliation Act of 1981, abolished the Community Services Administration in order to facilitate the Reagan Administration's effort to shift greater responsibility to the states for the administration of social programs. *Senate Comm. on Labor and Human Resources, Human Services Reauthorization Act of 1984*, S.Rep. No. 484, 98th Cong., 2d Sess., *reprinted in* 1984 U.S.Code Cong. & Admin. News 4847, 4849–50.

Funds appropriated under the CSBG program were allocated to the states according to the relative amounts that they had received from the Community Services Administration in fiscal year 1981.[1] Because many states had not played a major role in developing antipoverty programs before fiscal year 1981, the Act relieved the states of initial responsibility by mandating that for fiscal year 1982 they channel at least ninety percent of their CSBG funds to eligible entities. These were the local antipoverty organizations in existence during fiscal year 1981. *Id.* at 4850; 42 U.S.C. § 9904(c)(2)(A)(i) (1982).[2]

The Act also provided that during and after fiscal year 1983, states were to use at least ninety percent of CSBG funds to provide antipoverty programs through political subdivisions of the state or through nonprofit private community organizations. 42 U.S.C. § 9904(c)(2)(A)(ii) (1982). In appropriations bills for both fiscal years 1983 and 1984, however, Congress continued to require that states allocate at least ninety percent of their block grants to eligible entities, thereby restricting the amount of money that states could grant to new antipoverty organizations. 42 U.S.C. § 9902 (Supp.1987).

In October 1984, the CSBG Act was amended. Although Congress, in enacting the amendments, reaffirmed its commitment to funding primarily eligible entities, it also permitted states to channel a maximum of seven percent of the funds earmarked for antipoverty programs to organizations that were not eligible entities during the prior fiscal year. The remainder was to continue going to those organizations that were eligible entities during the prior year. Congress also broadened the definition of the term eligible entity to include any organization to which a state had

---

* Of the Ninth Circuit, sitting by designation.

1. The Act specifically provides that the Commonwealth of Puerto Rico is to be treated as a state. 42 U.S.C. § 9902(4) (1982).

2. The Act of 1981 defined an eligible entity as any organization which was officially designated as a community action agency or a community action program under the provi-

sions of section 210 of the Economic Opportunity Act of 1964 ... for fiscal year 1981.... [and] any limited purposed agency designated under title II of the Economic Opportunity Act of 1964 ... for fiscal year 1981 ... and any grantee which received financial assistance under section 221 or section 222(a)(4) of the Economic Opportunity Act of 1964 ... in fiscal year 1981.

42 U.S.C. § 9902(1) (1982).

made a grant under the Act during fiscal year 1984 pursuant to a waiver from the Secretary of Health and Human Services (HHS). 42 U.S.C. §§ 9902(1), 9904(c)(2)(A) (Supp.1987). Finally, the 1984 amendments introduced a new provision mandating that states that sought to cut off the funding of a community action agency could do so only for cause and only after giving the affected organization notice and an opportunity for a hearing on the record. The hearing officer's decision would be subject to review by the Secretary of HHS. 42 U.S.C. §§ 9904(c)(11)–9905a (Supp.1987).[3]

Congress enacted the most recent amendments to the CSBG Act in 1986. The term eligible entity was again expanded, this time to include organizations "which came into existence during fiscal year 1982 as a direct successor in interest to ... a community action agency or community action program...." 42 U.S.C. § 9902(1) (Supp.1987).[4] The 1986 amendments also provided that review of state defunding decisions would be conducted by the Secretary through HHS' Office of Community Services (OCS). 42 U.S.C. § 9905a(b) (Supp.1987).

*The Proceedings Below*

PROEO is the state entity responsible for administering CSBG funds and activities in Puerto Rico. ASPRI is a private, nonprofit organization that was created in 1982 to develop and implement community-based social welfare programs. The Commonwealth government intended that ASPRI would assume responsibility for "balance of state" CSBG activities—that is, antipoverty programs in poor communities not served by the Bayamon and San Juan municipal governments. In fiscal year 1983 PROEO designated ASPRI as an eligible entity and successor community action agency to the Puerto Rico Community Services Administration, the community action agency that had carried out balance of state programs until its termination on September 30, 1982. In fiscal years 1983 and

1984, PROEO allocated most of the CSBG funds to ASPRI for carrying out balance of state programs. In fiscal year 1985, PROEO again granted ASPRI most of the Commonwealth's CSBG allotment; in an agreement executed on October 1, 1984, PROEO agreed to give ASPRI over $11 million in monthly installments.

In November 1984, the Popular Democratic Party replaced the New Progressive Party as the ruling party in Puerto Rico. At the start of calendar year 1985, newly elected Governor Hernandez Colon appointed appellant Viera-Perez Executive Director of PROEO. PROEO did not remit to ASPRI funds for either August or September 1985, nor did it indicate whether it would provide monies to ASPRI for fiscal year 1986. ASPRI interpreted PROEO's failure to make budgetary plans for ASPRI for fiscal year 1986 as a notice of termination of funding. Regarding itself as a community action agency entitled by statute to a defunding hearing, ASPRI then filed suit against PROEO on September 27, 1985, in the United States District Court for the District of Puerto Rico. It sought preliminary and permanent injunctive relief: that the court order PROEO to acknowledge ASPRI as a community action agency entitled to a full due process hearing before termination. ASPRI also asked the court to enjoin PROEO from withholding funds for fiscal year 1986 and order PROEO to remit the August and September funds due pursuant to the 1984 agreement. ASPRI subsequently withdrew the latter request when PROEO delivered those funds.

The district court consolidated the preliminary injunction hearing with a hearing on the merits, and considered the propriety of the funding cutoff. On December 4, 1985, it issued an order (December 4 Order) mandating that PROEO continue funding ASPRI at the level afforded during fiscal year 1985 until an administrative hearing officer made a determination of whether there was cause to terminate funding.

**3.** The Act provides that

any community action agency or migrant and seasonal farmworker organization which received funding in the previous fiscal year under the Act will not have its present or future funding terminated under this Act unless after notice, and opportunity for hearing on the record, the State determines that cause existed for such termination....

42 U.S.C. § 9904(c)(11) (Supp.1987).

**4.** In this amendment, Congress expressly defined as "eligible entities" those organizations that were already required by the Act to be given "special consideration in the designation of community action agencies." 42 U.S.C. § 9904(c)(4)(B) (1982). *See Senate Comm. on Labor and Human Resources, Human Services Reauthorization Act of 1986,* S.Rep. No. 327, 99th Cong., 2d Sess., *reprinted in* 1986 U.S.Code Cong. & Admin.News 2092, 2108.

Noting that the 1984 amendments to the Act required states to grant community action agencies a hearing before terminating their funding, the court concluded that PROEO's refusal of ASPRI's funding for fiscal year 1986 "violate[d] [PROEO's] assurance, as statutorily required, to provide due process prior to termination of [ASPRI's] funding."

Implicit in this conclusion was a finding by the court that ASPRI was a community action agency; only a community action agency (or a migrant and seasonal farmworker organization) is entitled to a hearing under the Act. This implicit finding became almost explicit when the court noted that the Commonwealth had designated ASPRI "as an eligible entity and successor to the Puerto Rico Community Services Administration, the agency that had served the balance of state [programs] until September 30, 1982, when it closed operations."

PROEO responded to the December 4 Order by filing a motion on December 16, 1985, under Federal Rules of Civil Procedure 52(b) and 59(a) and (e) for additional determinations of facts, additional conclusions of law, a rehearing, an amendment of judgment, and/or a stay of the order pending appeal. PROEO sought to have the court amend its judgment to find that ASPRI had no legal right to receive a defunding hearing because ASPRI did not receive special consideration as a successor agency for fiscal year 1985.

The hearing ordered by the court in its December 4 Order had, in fact, begun almost two weeks before the order issued. On November 5, 1985, PROEO formally notified ASPRI that all funding for fiscal year 1986 would be terminated. The notice also stated that, even though PROEO was not required by law to grant ASPRI a defunding hearing, PROEO would do so voluntarily. The hearing began on November 22 and resumed on December 9, after the district court issued the December 4 Order. It culminated in a decision on June 18, 1986. Finding without discussion that ASPRI was a successor community action agency to the Puerto Rico Community Services Administration, the hearing officer focused on whether ASPRI had violated the contract made with PROEO by failing to provide adequate administrative fiscal control measures. He concluded that, because PROEO had proven ASPRI to be incapable of administering CSBG funds in a

manner that was fiscally responsible, PROEO was legally entitled to discontinue present funding and to refuse to fund the program for another fiscal year. ASPRI appealed the hearing officer's decision to OCS, and on November 19, 1986, OCS reversed the Commonwealth's determination that there was cause to terminate ASPRI's funding.

A few days before this decision by OCS, the district court, on November 13, issued a modification of its December 4 Order; it allowed PROEO to reduce ASPRI's funding from $11 million to $7 million for fiscal year 1987. The court also orally denied PROEO's post-trial motion, and the first appeal followed from this denial. In January 1987, PROEO filed a motion with the district court, asking it to modify the December 4 Order again, this time to reduce ASPRI's budget for fiscal year 1987 from the $7 million agreed upon in November to a little less than $5 million.

ASPRI then moved over to the agency. It appealed directly to OCS by a complaint filed on February 9, 1987. In the complaint, ASPRI alleged that the proposed fiscal 1987 plan was deficient because it showed the Commonwealth's intention to violate the statutory assurance that the majority of federal monies would go to eligible entities. ASPRI pointed out that PROEO, by calling itself an eligible entity, and by failing to mention ASPRI at all (except to describe PROEO's attempt to terminate ASPRI's funding), was rejecting the explicit finding made by the hearing officer during ASPRI's termination hearing that ASPRI, and not PROEO, was the direct successor in interest to the preexisting community action agency. On February 19, 1987, ten days after submitting this complaint, ASPRI filed its opposition in the district court to PROEO's January motion, reiterating the gist of ASPRI's complaint before OCS, and asking that the court stay action on PROEO's motion until OCS had issued a response to the complaint.

On April 16, 1987, in a letter issued to PROEO, OCS concluded that PROEO was not an eligible entity. In addition, OCS ruled that the Commonwealth must provide ninety percent of all block grant funds to the three eligible entities designated in Puerto Rico—the Municipality of San Juan, the Municipality of Bayamon, and ASPRI. PROEO asked that OCS withdraw its April 16 decision. By letter dated May 19, 1987, OCS refused to do so.

Meanwhile, on May 5, ASPRI had moved back into district court. Buttressed by the OCS ruling that PROEO was not an eligible entity, it filed a motion for contempt, alleging that PROEO's partial termination of funds to ASPRI for fiscal year 1987 violated the December 4 Order. ASPRI asked the court to order PROEO to restore and deliver ASPRI's full allotment of $11 million. In an order issued on July 9, 1987 (July 9 Order), the district court reaffirmed its December 4 Order by mandating that PROEO restore ASPRI's funding to the level afforded during fiscal year 1985—*unless and until* ASPRI was deprived of funding in accordance with the termination procedure required by the Act, or OCS changed its determination that ASPRI was a community action agency.

This appeal followed, and was consolidated with the prior appeal from the district court's denial on November 13, 1986, of PROEO's post-trial motions.

### ASPRI's Entitlement to a Hearing

Appellants argue that the district court erred in finding that ASPRI was a community action agency. They further argue that they are not precluded by the doctrine of collateral estoppel from arguing before this court that ASPRI is not a community action agency, and therefore not entitled to a defunding hearing under the Act. We need not address either of these arguments, however, because we find that the question of whether ASPRI was a community action agency should have been resolved initially by resort to the administrative remedies provided under the Act.

In *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638 (1938), the Supreme Court laid down the principle that "no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." *Id.* at 50–51, 58 S.Ct. at 463. Later, in *McKart v. United States*, 395 U.S. 185, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969), the Court reasserted the importance of the doctrine of exhaustion of administrative remedies. The Court explained that upholding the doctrine insured against "premature interruption of the administrative process"—a process that enabled the agency, like a trial court, to interpret a statute in the first instance and develop a full factual background upon which decisions should be based. *Id.* at 193–94, 89 S.Ct. at 1662. Furthermore, the Court ruled, "since agency decisions are frequently of a discretionary nature or frequently require expertise, the agency should be given the first chance to exercise that discretion or to apply that expertise." *Id.* at 194, 89 S.Ct. at 1663. And finally, the Court pointed out that the doctrine promoted judicial efficiency by encouraging a process that could very well moot the controversy. *Id.* at 194–95, 89 S.Ct. at 1662–63. *See Parisi v. Davidson*, 405 U.S. 34, 37–38, 92 S.Ct. 815, 817–18, 31 L.Ed.2d 17 (1972).

Recently, this circuit affirmed a district court's dismissal of a complaint on the ground that the plaintiffs should have first exhausted administrative remedies. *Ezratty v. Commonwealth of Puerto Rico*, 648 F.2d 770 (1st Cir.1981). After reiterating the rationale for the doctrine set forward in *McKart*, we concluded that exhaustion

> promotes a sensible division of tasks between the agency and the court: litigants are discouraged from weakening the position of the agency by flouting its processes, while court resources are reserved for dealing primarily with those matters which could not be resolved administratively.

*Id.* at 774. *See also Wilson v. Secretary of Health and Human Services*, 671 F.2d 673 (1st Cir.1982). Many other circuits have agreed with this basic assertion, and have applied the exhaustion doctrine in a variety of contexts. *See, e.g., Peter Kiewit Sons' Co. v. U.S. Army Corps of Eng'rs*, 714 F.2d 163, 167–68 (D.C.Cir.1983); *Deltona Corp. v. Alexander*, 682 F.2d 888, 892–94 (11th Cir.1982); *Bethlehem Steel Corp. v. EPA*, 669 F.2d 903, 907–08 (3d Cir.1982); *Shawnee Coal Co. v. Andrus*, 661 F.2d 1083, 1092–95 (6th Cir.1981); *Marshall v. Burlington Northern, Inc.*, 595 F.2d 511, 513–14 (9th Cir.1979).

Unless statutorily mandated, however, application of the exhaustion doctrine is not a jurisdictional requirement, but within the discretion of the district court. *Rodrigues v. Donovan*, 769 F.2d 1344, 1348 (9th Cir.1985); *Ezratty v. Commonwealth of Puerto Rico*, 648 F.2d at 774. And a district court, in deciding whether to apply the doctrine, must be sensitive to its purposes and to the particular administrative scheme involved. *McKart v. United States*, 395 U.S. at 193, 89 S.Ct. at 1662. Although usually exhaustion requires that an agency be allowed an opportunity to determine initially whether it has jurisdiction over the matter in ques-

tion, *Fed. Power Comm'n v. Louisiana Power & Light Co.*, 406 U.S. 621, 647, 92 S.Ct. 1827, 1841, 32 L.Ed.2d 369 (1972), judicial intervention may be warranted after evaluating the "extent of injury from pursuit of administrative remedy, degree of apparent clarity or doubt about administrative jurisdiction, and involvement of specialized administrative understanding in the question of jurisdiction." 4 K. Davis, *Administrative Law Treatise* § 26.5 at 432 (2d ed. 1983). *See Marshall v. Burlington Northern, Inc.*, 595 F.2d at 513.

■ We find no basis in the facts of this case for judicial intervention before the agency had an opportunity to determine whether it had jurisdiction over the matter in question. We hold that the parties prematurely raised, and the district court improperly decided, the issue of whether AS-PRI was a community action agency. There are three grounds for this holding.

First, courts may intervene in and enjoin the continuance of administrative proceedings only when there is a "clear showing of irreparable harm" absent immediate judicial review. *Renegotiation Board v. Bannercraft Clothing Co.*, 415 U.S. 1, 24, 94 S.Ct. 1028, 1040, 39 L.Ed.2d 123 (1974); *Randolph–Sheppard Vendors of America v. Weinberger*, 795 F.2d 90, 107 (D.C.Cir. 1986); *State of Cal. v. Fed. Trade Comm'n*, 549 F.2d 1321, 1323 (9th Cir.), *cert. denied*, 434 U.S. 876, 98 S.Ct. 227, 228, 54 L.Ed.2d 156 (1977); *cf. Mathews v. Eldridge*, 424 U.S. 319, 330–32, 96 S.Ct. 893, 900–01, 47 L.Ed.2d 18 (1976). Here, it was potential agency inaction, namely PROEO's alleged unwillingness to hold a defunding hearing, that ASPRI saw as the problem. Yet by the time that the district court issued its December 4 Order finding in effect that ASPRI was a community action agency, PROEO had not only consented to a hearing but the hearing had already begun. Consistent with principles of exhaustion, the district court should have left the question of ASPRI's *entitlement* to a defunding hearing to be decided by the agency. In fact, over the past two years both parties have continued to contest the question before OCS as to whether ASPRI or PROEO was an eligible entity. Recently OCS ruled in ASPRI's favor. Resolving the matter in this way, within the administrative agency, has caused neither

party irreparable harm. By this, we do not mean to imply that ASPRI would not have suffered irreparable harm from the termination of funds for its antipoverty programs. Yet that issue of irreparable harm goes to the question of whether a preliminary injunction should have issued, a question we need not consider because the trial court issued a *permanent* injunction.

Second, the initial question that the hearing officer had to resolve—namely whether ASPRI was a community action agency entitled to a hearing—was a jurisdictional one. If the officer had found that ASPRI was not a community action agency, he would not have had jurisdiction to decide whether sufficient cause existed to terminate ASPRI's funding. 42 U.S.C. 9904(c)(11) (Supp.1987). He clearly had jurisdiction, however, to decide whether AS-PRI satisfied the statutory prerequisites for a mandatory hearing: the widely endorsed rule is that an agency should make the initial determination of its own jurisdiction unless this jurisdiction is patently lacking. *Fed. Power Comm'n v. Louisiana Power & Light Co.*, 406 U.S. at 647, 92 S.Ct. at 1841; *Deltona Corp. v. Alexander*, 682 F.2d at 893; *Shawnee Coal Co. v. Andrus*, 661 F.2d at 1093; *State of Cal. v. Fed. Trade Comm'n*, 549 F.2d at 1324. Even if the hearing officer had refused to consider whether ASPRI was a community action agency, the Act's regulations provided another way of resolving the matter: by a complaint to the director of OCS. 45 C.F.R. § 96.50 (1986).[5] Here both the hearing officer and OCS passed on the issue. First, the hearing officer found that ASPRI was a community action agency. And OCS confirmed this finding twice, implicitly in November 1986, when it reversed the hearing officer's decision, and then explicitly later, in April 1987, when it ruled on AS-PRI's February 1987 complaint.

Third, resolving whether ASPRI was a community action agency necessitated the application of the statutory definition to a highly complicated factual situation. PROEO's argument that ASPRI was not a community action agency turned on whether PROEO had rendered its initial designation of ASPRI as a successor community action agency void by subsequent actions. The contention also turned on subtle interpretations of the Act in light of its amend-

---

5. The regulations in effect specified that a complaint submitted "must identify the provision of the act, assurance, or certification that was allegedly violated; must specify the basis for the

violations it charges; and must include all relevant information known to the person submitting it." 45 C.F.R. § 96.50 (1985).

ments. This is precisely the sort of situation that calls for agency expertise, especially when, as here, the statute is a new one that has undergone several amendments in just a few years. *Train v. Natural Resources Defense Council,* 421 U.S. 60, 87, 95 S.Ct. 1470, 1485, 43 L.Ed.2d 731 (1975); *Shawnee Coal Co. v. Andrus,* 661 F.2d at 1094-95; *cf. McGee v. United States,* 402 U.S. 479, 490, 91 S.Ct. 1565, 1571, 29 L.Ed.2d 47 (1971). Furthermore, the general rule that an agency should be permitted the opportunity to interpret its authorizing statute, *State of Cal. v. Fed. Trade Comm'n,* 549 F.2d at 1324; *cf. Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616, 625 (1964), *reh'g denied,* 380 U.S. 989, 85 S.Ct. 1325, 14 L.Ed.2d 283 (1965), takes on added significance here because the Act's own regulations mandate that HHS recognize the states to be "primarily responsible for interpreting the governing statutory provisions." 45 C.F.R. § 96.50 (1986). By deciding the question of ASPRI's status in the December 4 Order—when the same question was before the agency—the district court unnecessarily confronted an issue that fell within the agency's special competence. *Fed. Power Comm'n v. Louisiana Power & Light Co.,* 406 U.S. at 647, 92 S.Ct. at 1841.

### The Permanent Injunction

[4] Appellants argue that the district court erred in fashioning a remedy that essentially compels PROEO to maintain ASPRI's level of proportional funding unchanged. They contend that the legislative history of the Act demonstrates that the hearing requirement only applies to terminations of, and not reductions in funding. Although we agree with appellants that the effect of the district court's orders was to provide ASPRI with permanent injunctive relief at the level provided during fiscal year 1985, we need not address the merits of appellants' arguments. We vacate the December 4 and July 9 Orders because they violated, without justification, the doctrine of exhaustion of administrative remedies. Moreover, for the district court to have mandated that ASPRI receive a particular level of funding contravenes both the letter and spirit of the Act itself by usurping a power assigned by the Act to the agency. The case illustrates why the exhaustion doctrine reflects sound judicial policy. If applied, it would have obviated the shuttling back and forth between the agency and the district court. It also

would have precluded the district court from taking action contrary to the Act.

In passing the CSBG Act, Congress envisioned a flexible program that would heighten the responsibilities of states in administering and developing antipoverty programs. Federal funds would continue to flow to the states each year in amounts specified under the Act, but the states would be afforded some leeway in deciding how they wanted to use the money. *See Senate Committee on the Budget, Omnibus Budget Reconciliation Act of 1981,* S.Rep. No. 139, 97th Cong., 1st Sess., *reprinted in* 1981 U.S.Code Cong. & Admin. News 396, 936. In short, the statutory scheme embodied in the Act provides that the states, subject to federal approval by OCS, will make annual allocations to antipoverty organizations. 42 U.S.C. §§ 9903–04 (1982 & Supp.1987). Yet the district court assumed for itself the responsibility for overseeing the allocation of these funds in the Commonwealth. In the December 4 Order, it set ASPRI's funding at $11 million, and then in subsequent modifications of that order, on November 13, 1986 and July 9, 1987, it adjusted ASPRI's funding down to $7 million and then up again to $11 million. At one point the court urged the parties to "file a motion and call the [c]ourt" at the first sign of a problem. Although the court's goal in making this statement was a laudable one—namely avoidance of the "deterioration" of a relationship that had rendered the parties incapable of working together to provide antipoverty services—this goal is the initial responsibility of OCS. Under the Act, the Commonwealth must design a program allocating federal funds to various eligible entities; if any such entity objects to its funding level or more generally to its treatment by the Commonwealth, its remedy is to lodge a complaint with OCS. The district court should not have usurped the role of OCS by making itself the enforcing arm of the agency.

We need not consider the merit of ASPRI's argument that PROEO is seeking to effect a termination of ASPRI's funding by "killing it slowly"—that is, by reducing ASPRI's funding until it can no longer carry out effective antipoverty work. Nor need we consider whether a reduction, as opposed to a complete cessation of funds is protected under the Act's defunding procedures. 42 U.S.C. §§ 9904(c)(11)–9905a (Supp.1987). These are both issues that OCS must decide in the first instance. Af-

ter final action by OCS, the parties may then seek judicial review. 5 U.S.C. § 704 (1982). In fact, in its February 13, 1987, complaint to OCS, ASPRI has already protested its reduced funding. OCS has yet to respond to this part of the complaint. If ASPRI seeks interim relief, it should petition OCS in accordance with the Act's provision allowing OCS to provide continued funding pending the outcome of any termination proceeding. 42 U.S.C. § 9905a(a) (Supp.1987).[6]

*Conclusion*

Although we vacate the orders of the district court, we leave intact the major rulings issued by OCS. The first, issued on November 19, 1986, reversed the hearing officer's finding that the defunding of AS-PRI was for cause. And the second, issued on April 16, 1987, found that ASPRI, and not PROEO, was an eligible entity. Any appeals from the OCS rulings must be taken in accordance with the law governing judicial review of administrative action.

The judgment and orders of the district court are vacated.

*Reversed.* No costs to either party.

ORDER OF COURT

The motion for rehearing is denied.

■ In its petition for rehearing, ASPRI asserts that it has an express right of action against PROEO under 42 U.S.C. § 1983. *See Maine v. Thiboutot,* 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 553 (1980). ASPRI further asserts that because exhaustion of administrative remedies is not a prerequisite to bringing an action pursuant to section 1983, *see Patsy v. Board of Regents,* 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982), the district court's orders should not have been vacated for their failure to require exhaustion. ASPRI's petition is rejected for two reasons.

First, ASPRI did not raise a claim under section 1983 in its initial complaint of September 27, 1985, its amended complaint of October 19, 1985, or in its motion of May 5, 1987. Instead, ASPRI asserted that PROEO had "deprived [it] of property without due process of law as required by the Fourteenth Amendment to the Constitution" and had "terminated ASPRI's present funding under the CSBG Act without notice and hearing as required by 42 U.S.C. § 9904(c)."

Second, even construing ASPRI's complaint as stating a section 1983 claim under *Middlesex County Sewerage Authority v. National Sea Clammers Association,* 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981), the orders issued by the district court would have been vacated because they provided relief that was not "narrowly tailored to ensure compliance with the [Act]." *Lynch v. Dukakis,* 719 F.2d 504, 514 (1st Cir.1983).

In *Lynch,* the primary case relied upon by ASPRI, we affirmed a *preliminary injunctive order* issued by the district court in a class action brought under section 1983. The plaintiffs in *Lynch,* recipients of foster care, alleged that the Commonwealth of Massachusetts had violated a provision of the Social Security Act, 42 U.S.C. § 608(f) (1976), by "failing to develop and periodically review service plans" as provided by the statute. The court ordered the Commonwealth to comply with the case plan and review requirements of that law, and also issued specific rulings designed to facilitate this compliance. *Id.* at 508. We held that *Sea Clammers* did not preclude a section 1983 action because there was no "strong showing" of Congressional intent in the Social Security Act to make a section 1983 remedy unavailable. *Id.* at 511–12. We also noted that the district court's order was "in the nature of an outline of the requirements of federal law," and therefore left Massachusetts "the opportunity to propose other appropriate means of complying with federal law." *Id.* at 514. Therefore, we found that the order was not "broad and intrusive," but in sound compliance with the rule of equity jurisprudence suggesting that "the scope of injunctive relief is dictated by the extent of the violation established ... [and] the relief afforded [may not be] more burdensome than necessary to redress the complaining parties." *Id.* at 514 (*quoting Califano v. Yamasaki,* 442 U.S. 682, 702, 99 S.Ct. 2545, 2558, 61 L.Ed.2d 176 (1979)).

6. ASPRI already petitioned under this provision in October 1986, but was denied relief in December 1986 because the provision was an amendment that became effective on October 1, 1986, a date after the period about which ASPRI was complaining. Yet the provision would clearly be applicable to any allegedly illegal actions taken by PROEO after October 1, 1986. ASPRI, of course, will have to make the same argument in seeking interim relief that it would in seeking a termination hearing itself, namely that PROEO is attempting to effect a termination by dramatically reducing ASPRI's funding.

Here, the relief afforded by the district court exceeded that which was necessary to redress the complaint brought by AS-PRI. In ASPRI's original complaint, AS-PRI alleged that PROEO was violating the CSBG Act by terminating its funding without a hearing. The court's December 4 Order not only mandated that PROEO provide such a hearing in compliance with the Act, but went on to mandate permanent financial relief at the funding level provided during fiscal year 1985. As we suggested in our opinion, it might have been appropriate for the district court to have issued temporary relief: we did not "mean to imply that ASPRI would not have suffered irreparable harm from the termination of funds for its antipoverty programs." Maj. op. *supra* at 370–71. "Yet that issue of irreparable harm [went] to the question of whether a preliminary injunction should have issued," a question we did "not consider because the trial court issued a *permanent* injunction." *Id.* In short, the December 4 Order was too "broad and intrusive" in scope. It went beyond merely ordering what ASPRI asked for, namely a termination hearing, to provide a particular level of funding for ASPRI for an indefinite period of time. Unlike the relief afforded other plaintiffs who have brought actions under section 1983 for agency action in alleged violation of a statutory scheme, this relief had no stopping point. *See, e.g., Samuels v. District of Columbia*, 770 F.2d 184 (D.C.Cir.1985) (finding that the district court should have ordered the local public housing agencies to provide administrative grievance procedures to tenants who complained of adverse action by these agencies, as provided under controlling federal statute).

Moreover, in contrast to the district court's order in *Lynch*, the December 4 Order did not leave the federal agency overseeing the Commonwealth's activities—the Office of Community Services (OCS)—with the opportunity "to propose other appropriate means of complying with [the] federal law." *Lynch*, 719 F.2d at 514. Instead, through its order, the district court usurped "the role of OCS by making itself the enforcing arm of the agency." Maj. op. *supra* at 372. *Cf. Pennhurst State School v. Halderman*, 451 U.S. 1, 54 (1981) (White, J., dissenting in part) (arguing that the district court should not have assumed the task of managing a state hospital).

In the July 9 Order, the district court reaffirmed the gist of its December 4 Order, but did so knowing that yet another problem had arisen—that PROEO was seeking to terminate ASPRI's funding by dramatically reducing it. Because ASPRI did not frame this complaint as a section 1983 action, but rather as one alleging a violation of the December 4 Order, we will not now decide whether a section 1983 action challenging PROEO's reduction of funding without a hearing contrary to section 9904(c) would have been permitted under the general proposition of *Thiboutot* or foreclosed under the limiting principle of *Sea Clammers*. And we pass no judgment on whether it would have been appropriate for the district court to respond to such a section 1983 claim by providing ASPRI with temporary relief, even though ASPRI could petition OCS for such relief under section 9905a(a).